In the Matter of the Estate of Victor Spanier, Deceased.

Surrogate's Court, Kings County, September 18, 1933.

*Theodore Arnold,* for the petitioner.

*O'Melia & Garcia,* for Etty Spanier, Toni Spanier and Zisu-Ioseph Spanier, distributees.

WINGATE, S.   Victor Spanier, a Roumanian subject, died intestate in the borough of Brooklyn on January 15, 1933.   Letters of administration on his estate were issued to the public administrator on the twenty-fourth of the same month.   His sole next of kin were his widow, an adult son, and a daughter, who were all residents of Roumania.

On or about the seventh of February the Roumanian Consul instructed his attorney, Leon Bleecker, to appear in the proceeding and he accordingly served the usual notice in this regard on that date. On February eighteenth the widow and daughter in Roumania executed a power of attorney to protect their interests in the estate to Messrs. O'Melia & Garcia of New York city.   This instrument was recorded in this court on March 11, 1933.   On March twenty-third the Consul notified Mr. O'Melia of the receipt of a superseding power of attorney purporting to have been executed by the widow, son and daughter on March third.   This was not, however, duly authenticated and was not recorded.   On April twenty-seventh all three of these beneficiaries executed a further superseding power of attorney to Mr. O'Melia which was recorded on May eleventh.

The present application is made by Mr. Bleecker, who seeks an allowance from this court of the sum of $3,500 for the services alleged to have been rendered by him for the benefit of the three distributees between February seventh and May eleventh.

The nominal gross assets of the estate amounted to $70,816.92. A considerable portion of this, .however, was claimed as a gift *inter vivos* by a certain Rose Bierman.   After the partial trial of her claim, a settlement was made with her in the sum of $10,000, thereby reducing the nominal gross assets to between $60,000 and $61,000, and establishing the fact that the actual gross estate did not exceed this sum.   In the securities composing the principal of the estate, however, are included $18,000 par value of Elks Club bonds and $9,000 of Morris Plan bonds, with the result that the actual value of the gross estate at the time of the death, assuming the validity of the Bierman claim, did not greatly, if at all, exceed $35,000.

Other than minor, purely routine matters, the services alleged to have been rendered by Mr. Bleecker consisted almost entirely of collaboration with the public administrator and his counsel in the

sale of the drug store conducted by the decedent and in the settlement of the Bierman claim. No estimate of total time expended has been made by the petitioner.

It is apparent that the period covered by the services alleged to have been rendered naturally divides itself into three periods, namely, that from February 7, 1933, when Mr. Bleecker was retained by the Roumanian Consul, to March 11, 1933, when the power of attorney of the widow and daughter to O'Melia & Garcia was recorded in this court; secondly, from the latter date until March twenty-third, at which time the superseding power of attorney to the Roumanian Consul arrived; and, finally, from the latter date to May 11, 1933, when all authorization to deal with the subject-matter was vested in Mr. O'Melia. During the first period noted, the Roumanian Consul, whereas not directly authorized by the parties to represent them, possessed certain powers in this regard by reason of the provisions of the United States treaty with Roumania executed in June, 1881. During the second period, the Consul continued to exercise a similar authority in respect to the rights of the son, but any powers over the interests of the widow and daughter in the estate were superseded by their direct power of attorney to O'Melia & Garcia. (*Matter of Reiss*, 138 Misc. 845, 847.) Finally, during the last period, the consulate was directly authorized to represent the beneficiaries by reason of their power of attorney executed in March.

As noted in *Matter of Reiss* (*supra*), article XV of the treaty in question provides that Consuls " shall have the right to appear, personally or by delegate, in all proceedings on behalf of the absent or minor heirs or creditors " of their nationals " until they are duly represented." This then was the only charter of authority of the Consul General or the petitioner from February seventh until March eleventh in respect to the widow and daughter, and from February seventh until March twenty-third on behalf of the son. During this period the alleged services in connection with the sale of the drug store and a portion of those respecting the investigation of the Bierman claims were performed.

A perusal of the affidavit of services submitted by the petitioner in regard to these two matters renders it difficult to understand how a claim for services can be predicated thereon under the wording of the treaty. The sale of the drug store was an ordinary voluntary sale made in the usual course of administration and the performance of the routine duties by the administrator. It in no way involved any court proceeding in which alone article XV, paragraph second, of the treaty, authorizes intervention by the consular agent or his representative. It was the duty of the public

administrator to conduct such sale and to dispose of the business of the decedent to the best advantage. There is certainly no presumption that he would be derelict in such duties, and in any event, a proper time to call him to account in this regard would be upon his final accounting which has not yet occurred. Such final accounting would, of course, be a " proceeding " in which the consular representative might intervene under the terms of the treaty, provided he had not previously been superseded, as has now occurred; but there would appear to be no justification under the terms of the treaty for his prior intervention in any such matter.

The services connected with the Bierman claims were alleged to have been rendered in all three of the periods. In so far as they were rendered at a time prior to the direct authorizations to act, under the powers of attorney, the same considerations would apply as in relation to the transactions respecting the sale of the drug store. The distributees of the estate were not parties to these actions, and the interests of the estate as a whole were again fully represented by the public administrator, duly appointed in the premises. In so far, however, as these services purport to have been performed pursuant to the power of attorney executed by the distributees, the terms thereof would govern the authority therefor. This power of attorney is too long to quote *in extenso*. Suffice it to note that the authority given was limited to a representing of the principals in respect to the receipt and collection of distributable sums " which are now or will be in the future in the possession of any public administrator, surrogate's court, industrial commission or any other corporation or association, which have the necessary funds for the payment of the same." Whereas these terms might be broad enough to permit the institution of a direct action on behalf of the distributees or the appearance in defense of an action brought against them, it is not, as the court views the matter, sufficiently extensive to invest the donee of the power with the ability to employ counsel to collaborate with the duly appointed authorities in charge of the estate who were presumably adequately and properly defending the interests of the estate as a whole against the claims of this outside party.

Quite aside from the question of the authority of the Consul General himself under the terms of the treaty and of the power of attorney, to incur financial responsibility on behalf of these distributees in connection with these two matters upon which the petition for allowance is almost wholly based, there is a distinct question on the merits as to the benefits conferred.

Granting for the development of the argument, that the Consul possessed authority to enter into a retainer agreement binding upon

the distributees for the services of an attorney other than in a pending proceeding in this court, which on the facts of this case is most doubtful, the remuneration to which the latter would be entitled would depend wholly upon principles of *quantum meruit*. In the usual case this involves an evaluation based upon the size of the estate, the labor necessarily involved, and the professional standing of the person or persons performing the service. (*Matter of Sharp*, 140 Misc. 427, 433; *Matter of Scher*, 147 id. 791, 793.)

The authorization to the petitioner, Mr. Bleecker, by the Consul General, was a direct and personal one. The only services alleged to have been performed were claimed to have been rendered by an attorney by the name of Arnold and an individual by the name of Eller. Since no power of substitution was granted to. Bleecker by the Consul General, the most favorable view to the petitioner which can be taken respecting the connections of the actual actors with the matter, is that Arnold and Eller were clerks in Bleecker's employ, since " it is a familiar principle of agency that a delegated power cannot be delegated without the consent of the person originally conferring the power. *Delegatus non potest delegare.*" (*People ex rel. Cohoes R. Co.* v. *Public Service Commission*, 143 App. Div. 769, 776; affd., 202 N. Y. 547.) Furthermore, it appears from an exhibit attached to the reply affidavit herein that Eller was not an admitted attorney during the greater portion of the period, his admission to the bar taking place in April, 1933. The result is that such services as were actually rendered herein were only by employees of the petitioner and can scarcely have occupied more than thirty hours of their time. Merely clerical services are not compensable at the same rate as services by a duly admitted attorney. (*Matter of Scher*, 147 Misc. 791, 794; *Tinney* v. *Pierrepont*, 18 App. Div. 627.)

The mere performance of services is, in any event, insufficient upon which to base financial responsibility for *quantum meruit* remuneration. The performance thereof must be shown to have been reasonably necessary for the protection of the rights of the person sought to be charged. As has heretofore been noted, the present demonstration in this regard is wholly unsatisfactory. The interests of the estate, which obviously included those of the ultimate distributees, were fully protected by the administrator, his regularly retained attorney, and in the case of the Bierman claims by outside counsel, and the acts of the petitioner's clerks in this connection savor strongly of the interposition of volunteers. Nor can it be said that any convincing demonstration has been made that the services thus performed were of any benefit whatsoever to the distributees.

The size of the compensation requested, amounting, as it does, to almost ten per cent of the ultimate gross estate, would be out of all reason in an estate of this size and simplicity were it requested by the attorney for the administrator in return for complete administration and distribution of the entire estate. *A fortiori* it cannot be granted to one whose sole services extended only for approximately three months, involved no difficult questions, conferred no tangible benefits, and were performed wholly by employees. Unquestionably, the formal appearance of the Consul General by his attorney was justified under the terms of the treaty and a certain remuneration from the interests of the distributees should be made therefor. Their present attorney in fact has, in his brief, stated that if any remuneration whatsoever is allowable, not exceeding $250 will be agreeable to those whom he represents. In the opinion of the court this sum would be liberal for the services performed on the demonstration herein made. Compensation to this extent, only, will be granted.

Proceed accordingly.