In the Matter of the Estate of Vito Pagnotta, Deceased.

Surrogate's Court, Kings County, December 24, 1936.

*Salvatore & McConnell [Charles R. McConnell* of counsel], for the petitioner Theresa F. Pagnotta, as administratrix, etc., of Vito Pagnotta, deceased.

*Furst, Schwartz, Schwager & Landau,* for the respondents Scheilke & Aliano.

WINGATE, S. The essential facts in this proceeding are undisputed. It seeks a substitution of attorneys, a determination of the reasonable value of the services of the attorneys who have been superseded and for a refund of sums paid them in so far as they are in excess of the sum thus determined to be reasonable.

It is uncontroverted that prior to the death of the decedent, the firm of respondent attorneys had acted in that capacity both for the decedent and for at least one of his children, the present administratrix. Soon after the death, the present petitioner consulted these attorneys regarding the procedure necessary for the settlement of the estate. These attorneys insisted upon receiving a written retainer assented to in writing by all of the distributees of the estate. It is asserted and not controverted that the attorneys at first insisted that the fees to be paid them should be eight per cent of the *gross* estate. The retainer, as signed, called for a payment of seven per cent of the gross estate.

It is alleged in the petition and in nowise controverted " that this retainer was signed   *   *   *   on the assurance of the attorneys that this was a very moderate arrangement for such proceedings, and further it was entered into in full reliance upon the representation of these attorneys, because they had handled the affairs of the decedent in his lifetime."

The first consultation with the attorneys occurred on October 5, 1936, and less than a month later, namely, on November fourth, the attorneys insisted upon receiving from the administratrix payment in full for all services performed and to be rendered in future. The sum then paid them totaled $3,525.60, being $3,500 for fees and $25.60 for alleged disbursements, this amount being accepted in lieu of the sum of approximately $4,900, which would have been payable under the terms of the written retainer.

The petitioner states that, following this, she lost confidence in the respondents, and on November 6, 1936, they were notified that other counsel had been engaged in their stead.

Accepting as true the statements of the respondents respecting their services in connection with the affairs of the estate, it appears that they were first consulted on October 5, 1936, and were discharged on the following November sixth. Their tenure of office accordingly lasted for just thirty-three days, including Sundays and holidays. The only services performed by them during this period, according to the allegations of the Scheilke affidavit, aside from various more or less vague statements regarding conferences held with the administratrix and certain of the distributees, consisted of preparation of renunciations of the right to letters voluntarily executed by those equally entitled with the administratrix, preparation and submission of petition for letters and arranging for surety company bond, arranging for and attending at the opening of the safe deposit box of the decedent, obtaining the waivers on four bank accounts and arranging for their transfer to the name of the administratrix, preparing a consent to the payment of a claim of a distributee, which was signed by the others interested, obtaining eight certificates of the issuance of letters, paying the hospital and funeral bills and ten debts aggregating $5,688.47, of which two totaled $3,700.60 and included the service fee due to themselves, obtaining the appointment of a New York estate tax appraiser and preparing the schedules for that proceeding, interviewing an alleged debtor of the estate who produced a receipt in full, and preparing Federal estate tax schedules. In an apparent effort to increase this meagre recital of services, there is also listed as a service performed the preparation of their own retainer agreement, a talk with a man

who called upon them respecting possible reacquisition of property upon which the decedent had foreclosed a mortgage, and investigation of the status of two mortgages of $8,000 and $13,000, respectively. The attempted padding by means of the latter item appears obvious from the admission in the Aliano affidavit that these mortgages had been serviced by the respondents for the decedent, wherefore the attorneys must obviously have been fully acquainted with their status.

The foregoing statement of services is advanced by the attorneys as justification for the charge of $3,500 to this estate and they append an affidavit by a member of the bar who swears to his opinion that they were reasonably worth $5,000. The court is not without some acquaintance with the value of services of this type and would deem a payment of a fifth of this sum liberal almost to the point of generosity. In an uncontested intestate estate of the extreme simplicity of the present, the remuneration provided in the retainer agreement was extortionate to a shocking degree.

In spite of these uncontroverted facts and the admission by the attorneys " that this retainer was signed * * * on the assurance of the attorneys that this was a very moderate arrangement for such proceedings," upon which reliance was placed by reason of the fact that the attorneys had represented the decedent in his lifetime, the respondents challenge the authority of the court to compel them to refund the sum exceeding reasonable compensation for their services which they have exacted from those who confided in their probity and fairness. This court accepts the challenge.

It is primary that a client possesses the unqualified right to change attorneys at any time he sees fit and for any reason, good, bad or indifferent, which may appeal to him. (*Martin* v. *Camp*, 219 N. Y. 170, 174; *Robinson* v. *Rogers*, 237 id. 467, 470; *Matter of Krooks*, 257 id. 329, 331; *Matter of Tillman*, 259 id. 133, 135; *Matter of Lydig*, 262 id. 408, 409.)

Upon the exercise of such right by the client, any agreement respecting compensation is wholly abrogated and the compensation of the attorney is determinable solely on the basis of *quantum meruit*. (*Matter of Tillman*, 259 N. Y. 133, 135; *Matter of Montgomery*, 246 App. Div. 495, 497.)

The rights consequent upon a retainer agreement cannot better be stated than in the words of Judge (now Chief Judge) CRANE in *Rodkinson* v. *Haecker* (248 N. Y. 480, at p. 489):

" As a general principle, a lawyer may make a contract with his client either for future or past services. Such a contract for compensation will be enforced unless it appears to have been procured by fraud, deceit, overreaching, undue influence, or through any

other means which would move a court of equity to modify or set it aside. The circumstances may be many, which would prevent the enforcement of the agreement. No one can undertake to specify the instances. Sufficient to state that no undue advantage can be taken of the relationship or of the circumstances or of the client to procure such a contract. The courts are very sensitive of the honor of the bar. Transactions between a lawyer and his client must be fair. Unless unreasonable upon its face, the contract, however, like any other contract is presumed to be fair until the contrary appears. It is a matter of proof. Seldom, if ever, can a contract be sued upon without the circumstances of the transaction appearing. A lawyer and his client may have an account stated between them the same as other persons.

" It is always open, however, for the client to plead or to show that for some equitable reason it should not be enforced. Equity is a patient listener to all such charges, examines them carefully and thoroughly."

In the case at bar the contract of retainer is " unreasonable upon its face " as almost any contract for a percentage of the gross assets of an estate must be. Such a basis of compensation takes into consideration only one of a number of essential criteria for the determination of the reasonable value of services. Others of like importance are the difficulty of the questions, the amount of time and labor involved, whether the conduct of litigated matters was required, the standing of the attorneys rendering the services, the extent to which they were of a purely clerical nature, etc. (*Matter of Spanier*, 148 Misc. 879, 883; affd., 241 App. Div. 615; *Matter of Mackenzie*, 155 Misc. 822, 825; *Matter of Sharp*, 140 id. 427, 433.) To attempt to base a determination upon only one of these pertinent considerations is as patently absurd as to attempt to compute the volume of a cube by a mere measurement of its height, disregarding its width and depth.

Irrespective of this patent general fact it has been clearly demonstrated that the operation of the present agreement is latitudes distant from that standard of fairness to which all " transactions between a lawyer and his client must " conform.

The contract was procured by the attorneys by a combination of constructive if not, indeed, actual fraud in their misrepresentation that the arrangement which they proposed was moderate and usual, and the admitted reliance of the clients upon these representations by reason of the relations of client and attorney which had previously existed between one of their number and the decedent on the one hand, and the attorneys on the other.

The client now appeals to the equitable powers of this court " to modify or set it aside " by reason of this taint of fraud and overreaching on the part of the attorneys, and the court can conceive of few instances in which these powers could be more justly exercised. The taint of fraud first encountered in the initial agreement inevitably carries through all other financial transactions between the parties and renders voidable at the election of the defrauded petitioner the payment made to the attorneys which was virtually coerced by reason of the existence of the initial retainer. She petitions for its revision and this relief must follow as a matter of course from the declaration of invalidity of the initial contract. (*Matter of Woolfson*, 158 Misc. 928, 932.)

The resulting situation is that the respondents have in their possession a sum of money to which they have no claim of right and are entitled to be recompensed in a lesser sum for the services which they have performed. In this situation the addition to section 231-a of the Surrogate's Court Act made by chapter 332 of the Laws of 1934 grants express jurisdiction to this court to award relief. It reads: " In the event that any such attorney has already received or been paid a sum in excess of the fair value of his services as thus determined, the surrogate shall have power to direct him to refund such excess."

In view of the utter simplicity of the affairs of the present estate, the complete harmony of all parties in respect to its conduct and their co-operation with the attorneys in its administration, the court deems the sum of $1,000, plus actual disbursements, a reasonable and liberal compensation for the services demonstrated to have been rendered. Since in addition to their disbursements they have received the sum of $3,500, they will be directed to refund the excess of $2,500 to the petitioner and to surrender to their successors all documents or other property belonging to the estate which are in their possession.

Enter decree on notice in conformity herewith.